IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TERRY L. JAMES,                        )
                                       )
                 Plaintiff,            )
                                       )
vs.                                    )        Case No. 06-0899-CV-W-ODS
                                       )
MICHAEL J. ASTRUE,[1]                  )
Commissioner of Social Security,       )
                                       )
                 Defendant.            )

ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING
DISABILITY INSURANCE BENEFITS

         Pending is Plaintiff's request for review of the Commissioner's final decision
denying his application for benefits under Title II and Title XVI of the Social Security Act.
For the following reasons, the Commissioner's decision is affirmed.


I.  BACKGROUND


         Plaintiff was born in November 1952, completed high school and one year of
junior college, and is a Certified Nursing Assistant ("CNA").  He has prior work
experience as a CNA, prep cook, and fast food cook.  His work record consists of
sporadic stints as a CNA, with the last stint occurring between January 2003 and
February 2003.  R. at 79-81.

         In February 2000 – before Plaintiff's first job as a CNA – Plaintiff went to Swope
Parkway Health Center ("Swope") complaining of back pain.  He described his sleep as
"good" and denied using illicit drugs.  He was counseled about his alcohol usage and
prescribed Norvasc for blood pressure, but there does not appear to be any specific
treatment prescribed for his back.  R. at 143-44.  Plaintiff returned to Swope

---

         [1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social
Security and should, therefore, be substituted as the Defendant in this case.  Fed. R.
Civ. P. 25(d)(1).

approximately six weeks later, again described his sleep as "good," and obtained a refill of Norvasc. There is no record of Plaintiff complaining of back pain in this visit. R. at 141-42.

On March 13, 2001, Plaintiff complained of pain in his legs that was usually worse at night. R. at 139-40. X-rays were taken and revealed "[d]isc space narrowing from L3-S1 and L1-L2. . . . There is degenerative osteoarthritis of [sacroiliac] joints." R. at 146. Celebrex was prescribed and Plaintiff reported that his back was "improved." R. at 137-38. On May 9, 2001, doctors at Swope indicated Plaintiff's "meds work well" and continued the prescriptions for both Norvasc and Celebrex and added a prescription for Ultram to help with Plaintiff's pain. R. at 135-36.

On January 30, 2002, Plaintiff went to Swope complaining of flu-like symptoms. He reported usually getting eight hours of sleep a night and still denied having used illicit drugs. The record reflects Plaintiff was advised to stop smoking. R. at 133-34. Ten weeks later, Plaintiff returned because he was "out of Norvasc" for several weeks. The prescription was refilled, and Plaintiff was again advised to stop smoking. R. at 131-32.

In September 2002, Plaintiff went to Truman Medical Center ("TMC") complaining of back pain he had been experiencing for two months. X-rays revealed "significant intervertebral disc space narrowing at the L3-4, L4-5, and L5-S1 levels." R. at 119-21. Plaintiff also reported he had not been taking the Norvasc. R. at 121. Plaintiff was prescribed Vicodin and Flexeril for his back and Norovasc for blood pressure. R. at 122.

On March 25, 2003, Plaintiff returned to Swope complaining of leg pain over the last two years. He also reported being off his blood pressure medications for one month. The doctor gave Plaintiff prescriptions for Norovasc, a pain reliever, and an anti-inflammatory and told him to return in two weeks. R. at 130. Upon his return, Plaintiff reported the "pain meds help a lot." R. at 128. In mid-September, Plaintiff obtained a refill of his medications. R. at 124-25. As with all his prior visits, Plaintiff denied using illicit drugs.

On March 24, 2004, Plaintiff went to Swope's behavioral health department and reported he was having difficulty sleeping and controlling his anger, heard voices telling

2

him to hurt others, and was depressed. R. at 254-60. He also admitted to having been "caught up in alcohol and drugs" in the past, but denied smoking crack in the past year. R. at 258. Nonetheless, Plaintiff's substance abuse was considered a factor contributing to his situation. R. at 254, 258. Plaintiff was placed on a waiting list for therapy. R. at 255. Approximately five weeks later, Plaintiff sought medical treatment for what he described as "muscle pain" in his back and legs that had "been ongoing for 10 yrs." He was not taking medication previously prescribed for his back, and also was not taking blood pressure medication. These prescriptions were refilled. R. at 252-53.

Plaintiff returned to Swope's behavioral health department on May 28, 2004, and described himself as "depressed." He admitted to abusing alcohol and marijuana two months prior (around the time of his first visit to the behavioral health department), but described his cocaine use as occurring a "long time back." He denied thoughts of suicide or homicide, and was prescribed Lexapro with instructions to return in three weeks. R. at 251. On June 9, Plaintiff went to the Western Missouri Mental Health Center due to his depression and thoughts of harming others. The intake forms reflect Plaintiff admitted to abusing alcohol, marijuana and cocaine, but the person taking the information opined Plaintiff was "minimizing." R. at 184. Plaintiff's GAF score was 40, based on his plans to burn down his mother's house and his self-reported abuse of drugs and alcohol. R. at 187. During this visit, he told doctors he had "applied for disability but . . . . recently started feeling well enough to go back to work due to taking Celebrex." R. at 188. He was checked in for observation and discharged on June 11. The first page of the discharge form appears at page 183 of the Record, but the second page – including any prognosis or prescribed treatment – is absent.

In June, July and September of 2004, Plaintiff obtained refills of his medications except for the Lexapro. R. at 244-49. On November 24, the behavioral health department discharged him from its care because he had not returned since his last appointment. R. at 243.

On February 14, 2005, Plaintiff was seen by Alan Israel, a Certified Psychologist. Plaintiff reported he "had problems with alcohol for most of his life but recently has cut down the amount he drinks. . . . He indicates that he used marijuana for most of his life

and still periodically does that. He states that he used coke for the last 15 years but within the last year went to K.C.C.C. and completed their inpatient program." Plaintiff represented that he had not used crack cocaine in the last six months. Plaintiff's depression and frustration was largely the product of the fact that he was not working more than a part-time job, and his GAF score was assessed at 50. R. at 263-65.

In late April 2005, Plaintiff went to TMC complaining of chest pain, and admitted he had been smoking cocaine the day before the pain began and tried treating the pain by drinking alcohol. Plaintiff reported drinking "a pint of whisky per day, heavy, as well as a fifth of gin and vodka with beer." R. at 212. Examination of his heart did not reveal evidence of a heart attack or other similar ailment. R. at 219-28. However, examination of his lungs revealed obstructions believed to be related to emphysema, and use of a bronchodilator was suggested. R. at 217-18. He was advised to discontinue use of narcotics. He allegedly stopped smoking in May 2005, R. at 207, but the following month described himself as "trying to quit smoking," R. at 197, and on June 30, 2005, told the doctor he had "smoke[d] half-a-pack of cigarettes a day for the last 40 years." R. at 194. Also in June, Plaintiff's medication for COPD was changed, producing positive results. R. at 195, 205.

During the hearing held in October 2005, Plaintiff testified he last worked the preceding May. His position was a part-time job cleaning apartments, R. at 272, and he held that job for approximately four or five months. R. at 284. In the Fall of 2004, Plaintiff worked on a maintenance crew. R. at 273. His last full-time job was in 2003 as a CNA; he had to quit that job because he was missing time due to the pain in his hips and the effects of COPD. R. at 274. He reported suffering from COPD since 1997 but claimed to have stopped smoking four or five months before the hearing and was feeling better – although he still experienced shortness of breath when walking. R. at 276-77. He estimated that he could walk two blocks, stand for fifteen to twenty minutes at a time, and stand for a total of two hours per day. At that point, pain and shortness of breath would require him to sit down. R. at 278. It also hurts to lift things. R. at 278-79. Plaintiff began using a cane approximately two to three months before the hearing, although its use was not prescribed by a doctor. R. at 275. Plaintiff also reported

feeling "real sad" and depressed. R. at 282. His daily activities consist of reading, going to the library, surfing the internet, and looking for opportunities to get an education at home. R. at 274-75. Plaintiff testified he had never performed a "sit-down" job. R. at 285.

Plaintiff's drug use was discussed during the hearing. He testified he first used crack cocaine in 1988, but did not use it continuously. He relapsed for one day in May 2005 after being clean for one year. Following that relapse he went to a detox center for three days. R. at 285-86; 288.

A vocational expert ("VE") testified in response to hypothetical questions. She was asked to assume a person of Plaintiff's age, education, and work experience capable of performing light work but unable to climb ladders, ropes or scaffolds or be exposed to concentrated airborne irritants. The VE testified such an individual could not perform their past relevant work. R. at 291. The hypothetical was changed to add a limitation on contact with others; specifically, no contact with the public and limited contact with coworkers. The VE testified such an individual could perform unskilled work at the light level, such as assembler, packager, and mail sorter. R. at 292. The VE also testified sedentary jobs would be available. R. at 292. When asked to assume the individual "could walk up to two blocks at a time with the use of a cane, stand for 15 or 20 minutes, for a total of being on his feet two hours out of an eight-hour day, [and] occasionally lift items weighing less than 10 pounds" the VE testified such a person would be capable of doing only sedentary work and with those limitations no sedentary work would be available. R. at 294.

The ALJ found Plaintiff's functional limitations to be limited by his mental impairments. Specifically, he found Plaintiff was moderately limited in the activities of daily living and markedly limited in the areas of social functioning, concentration, persistence and pace, and rated a one for episodes of decompensation. However, the ALJ determined Plaintiff's limitations were augmented by Plaintiff's drug and alcohol abuse; ignoring these factors the ALJ concluded Plaintiff was only moderately limited in the areas of social functioning. R. at 20-21.

Case 4:06-cv-00899-ODS   Document 12   Filed 07/18/07   Page 5 of 9

The ALJ also found Plaintiff suffers from emphysema/COPD, degenerative disk disease and depression. Other conditions – such as blood pressure and anxiety – were treatable either with medication (in the case of the former) or by not abusing narcotics or alcohol (in the case of the latter). R. at 21. The ALJ then considered Plaintiff's credibility and found it wanting. While Plaintiff's part-time work did not qualify as substantial gainful activity, the duties of that job conflicted with Plaintiff's self-described limitations. No doctor suggested Plaintiff used a cane, and no doctor suggested Plaintiff was as limited as he testified. The medical records reflect Plaintiff's COPD and disk disease were minor, and Plaintiff's statements to doctors did not describe physical limitations of the seriousness he alleged; to the contrary, his statements described improvement and satisfactory treatment such that he contemplated his return to work. Plaintiff failed to follow his doctors' advice in a variety of respects, including failing to take blood pressure medication and continuing to smoke. Plaintiff's testimony that he had been drug-free for a year before relapsing in May 2005 was belied by the medical records. The ALJ concluded Plaintiff retained the capacity to lift or carry up to ten pounds frequently and twenty pounds occasionally, stand or walk for six hours in an eight hour day, sit for six hours in an eight hour day, could occasionally climb stairs and could not climb ladders or ropes, and needed to avoid airborne irritants and any work involving contact with the public. Based on these findings and the VE's testimony, the ALJ determined Plaintiff could perform work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final

decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences.  House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> > 1.  The claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication;
> > 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

7

739 F.2d at 1322.

The Court accepts Plaintiff's argument that his subjective complaints cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, the medical evidence remains a factor to be considered, and that evidence – combined with other evidence in the Record – supports the ALJ's determination. All of the reasons cited by the ALJ (and summarized above) for discounting Plaintiff's testimony about his limitations and capacity are valid and supported in the Record. While there is no doubt Plaintiff suffers from degenerative disk disease and COPD, Plaintiff's failure to follow his doctors' advice for treatment, admission that treatment was effective, his daily activities, and the opinions of his doctors provide substantial evidence to support the ALJ's assessment of Plaintiff's residual functional capacity.

Plaintiff also faults the ALJ's assessment of the effect of Plaintiff's drug and alcohol abuse. A person is not disabled if alcoholism or drug addiction is a contributing factor to the applicant's disability. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(J). Here, Plaintiff did not seek mental health treatment during his alleged periods of sobriety, and his quests for treatment all followed relapses into cocaine use or alcoholic binges. Drug and alcohol abuse were cited as factors by the mental health specialists. On this Record, the ALJ was justified in concluding Plaintiff's mental health problems were related to his alcohol and drug use. Cf. Vester v. Barnhart, 416 F.3d 886, 890-91 (8th Cir. 2005) (holding "it is within the ken of the ALJ to make a factual finding that the claimant is able to work when she is not abusing alcohol," but even if it is not medical evidence demonstrating relationship between disability and alcohol abuse is sufficient to justify assessment). This is particularly so given that Plaintiff bore the burden of demonstrating his drug and alcohol abuse did not contribute to his mental limitations. Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).

8

III.  CONCLUSION


The ALJ's determination of Plaintiff's residual functional capacity excluding the effects of alcohol and drug abuse are supported by substantial evidence in the Record as a whole.  Therefore, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.


/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: July 18, 2007                              UNITED STATES DISTRICT COURT